UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
STEPHANIE A. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-7780
Fax (410) 962-1812

January 19, 2018

LETTER TO COUNSEL

   RE: *CX Reinsurance Company Limited, f/k/a CNA Reinsurance Company Limited v. Devon S. Johnson*; Civil Case No. RWT-15-3132

Dear Counsel:

  Pursuant to Judge Titus's January 19, 2017 Order, this matter has been referred to me for discovery disputes and related scheduling matters. [ECF No. 40]. Presently pending is Intervenor-Defendant Devon Johnson's ("Johnson") Motion to Compel documents [ECF No. 89], CX Reinsurance Company Limited's ("CX Re") Opposition [ECF No. 95], Johnson's Reply [ECF No. 99], and CX Re's Surreply [ECF No. 101-1].[1] I find that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Johnson's Motion to Compel is GRANTED in part and DENIED in part.

  **I.** **Background**

  In this action, CX Re seeks to rescind commercial general liability insurance policies ("Policies") issued to Benjamin L. Kirson ("Kirson"), and other named insureds in 1997, 1998, and 1999. Pl.'s First Am. Compl., [ECF No. 17 ¶¶ 1, 7, 8]. The Policies provide insurance coverage for certain risks, including lead exposure, relating to specified residential rental properties in Baltimore, Maryland. *See* Policies, [ECF Nos. 1-2, 1-3].

  In particular, CX Re alleges that Kirson made a misrepresentation of material fact by falsely answering "No" to Question 16 of the Application upon which the Policies were issued, which asks whether "the [i]nsured ever had any lead paint violations in the building(s)[.]" [ECF No. 17 ¶¶ 1, 13, 19-24]. CX Re argues that, if Kirson had answered this question truthfully, CX Re would not have issued the Policies, or would have issued the Policies subject to substantially higher premiums or substantially different terms. *Id.* ¶ 32. CX Re asserts that, "after learning of and investigating Kirson's misrepresentation . . . , [it] filed this rescission action." *Id.* ¶ 34.

  On August 8, 2016, Johnson won a $1,628,000.00 judgment against Kirson in State court, representing damages for injuries sustained from lead paint exposure at a property covered by CX Re's policy. *Devon Johnson, A Minor By His Next Friend v. Benjamin L. Kirson*, 24-C-14005926; [ECF No. 19 ¶ 2]. Thus, to protect his interests, demonstrate that CX Re's policy remains in effect, and ensure that "rescission is inoperative and invalid as to his claims[,]"

---

[1] CX Re's unopposed motion to file surreply [ECF No. 101] is GRANTED, though none of the arguments therein materially affected the analysis.

Johnson intervened in this action on January 18, 2017. [ECF Nos. 19 ¶ 3, 38, 39]. Upon intervening, Johnson was "forbidden from taking discovery except to the extent" it was nonduplicative of discovery sought by Kirson. [ECF No. 38 at 2]. On October 5, 2017, Kirson was dismissed with prejudice from this case, rendering Johnson and CX Re the only remaining parties. [ECF No. 81]. Prior to being dismissed, however, Kirson issued to CX Re a request for production of documents, and CX Re served its responses and objections. *See* [ECF Nos. 89-3, 89-5]. Upon Kirson's dismissal, this Court permitted Johnson to "file a motion to compel responses to discovery requests that [Kirson] originally propounded." [ECF No. 83 at 1].

The instant discovery dispute revolves around Kirson Document Request Nos. 1, 2, 3, 11, and 18, which, Johnson contends, seek information "relating to its affirmative defenses of laches and waiver." [ECF Nos. 89 at 5, 89-3]. Specifically, CX Re objects to producing three categories of documents responsive to these requests: (1) documents in its or Pro UK's possession regarding the existence of chipping or flaking paint, or lead paint on the surfaces at Kirson properties, unless the documents contain "'evidence' of those conditions (such as deposition testimony or health department inspection records)" as opposed to mere "'allegations' of deleterious lead paint conditions (such as complaints alleging damages due to exposure to flaking or chipping lead paint);" (2) documents that include either "allegations" or "evidence" of lead paint at Kirson properties that are in the possession of Pro IS, Inc. ("Pro IS"); and (3) documents relating to its underwriting review involving insureds other than Kirson. [ECF No. 89 at 5-6]. CX Re argues that Johnson's Motion to Compel is untimely and, alternatively, that the documents sought are irrelevant. [ECF No. 95 at 3-13]. These arguments are addressed below.

**II.    Johnson's Motion to Compel is Timely.**

CX Re first contends that, because "Johnson now stands in Kirson's shoes" in filing his Motion to Compel, Johnson "is subject to all defenses and arguments to which Kirson would have been subject had he remained in the case." [ECF No. 95 at 3]. This Court's Local Rules require that a party, if unable to informally resolve disputes regarding a party's document production, must "serve a motion to compel within thirty (30) days of" receiving the response. Loc. R. 104.8(a) (D. Md. 2016). CX Re served its responses to Kirson's first request for production of documents on October 3, 2016 [ECF No. 89-5 at 20], and Kirson never filed a motion to compel. Thus, because the window to file a motion to compel would be closed as to Kirson, CX Re argues it is necessarily closed for Johnson as well. [ECF No. 95 at 3].

CX Re's argument is without merit. The Local Rules also expressly provide that the "Court may, in a particular case, suspend the provisions of any . . . Rule[] . . . and may order proceedings in accordance with its direction." Loc. R. 604 (D. Md. 2016). On October 6, 2017, well after the thirty day window would have closed for Kirson, this Court, nonetheless, expressly permitted Johnson to "file a motion to compel responses to discovery requests that [Kirson] originally propounded." [ECF No. 83 at 1]. Had the Court intended for Johnson to be bound by the same time requirements as Kirson, it would not have permitted him to file the motion. Local Rule 104.8 thus does not provide grounds to deny Johnson's Motion to Compel.

### III. Documents in CX Re's or Pro UK's Possession Regarding Lead Paint Conditions at Kirson Properties

CX Re next objects to producing documents in its or Pro UK's possession that only "allege" but do not consist of "evidence" of deleterious lead paint conditions at Kirson properties. [ECF Nos. 89 at 7-16, 95 at 4-8]. CX Re contends that this Court held in *CX Re v. B&R Management, Incorporated*, No. ELH-15-3364, ECF No. 229 ("*B&R Management*") that documents consisting of only "allegations" of deleterious lead paint conditions are irrelevant. [ECF No. 95 at 4]. Johnson, meanwhile, argues that, regardless of whether they consist of only "allegations," the documents are relevant to: (1) his laches defense; and (2) his waiver defense. [ECF No. 89 at 7-16].

As background, in *B&R Management*, a defendant, Jessica-Carl, Inc. ("Jessica-Carl"), sought documents from CX Re and Pro UK regarding a lead paint lawsuit filed by Tyrell Stokes ("Stokes Claim") against Arbor, Inc., a named insured under the Policies. No. ELH-15-3364, ECF No. 229 at 2. In the Stokes Claim, which settled for $710,000.00 in 2012, Ms. Stokes alleged injury from exposure to lead paint at an insured property, where she resided from 1998 to 2000. *Id.* Jessica-Carl argued that documents concerning the Stokes Claim would demonstrate that B&R Management's answers to Questions 12 and 14 on the Application were false and, as such, that CX Re's claims were barred by limitations and laches because it was "on inquiry notice of claims for rescission or for fraud more than three years before it filed its Complaint."[2] *Id.* In reaching its holding that the requested documents were not relevant, this Court relied, in part, on the "extraordinary situation" standard, which provides that insurers in Maryland, like CX Re, generally "do not have a duty to investigate insurance applicants and are entitled to believe what an applicant claims to be true." *Id.* at 3 (quoting *N. Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 731 (D. Md. 1997)). A duty to investigate, however, can arise in "extraordinary circumstances." *Encompass Home and Auto Ins. Co. v. Harris*, No. CIV.A. GLR-12-2588, 2013 WL 6095496, at *6 (D. Md. Nov. 19, 2013) (citing *N. Am. Specialty Ins. Co.,* 977 F. Supp. at 731). Extraordinary circumstances exist when the insurer is "'on notice that some type of investigation is necessary' because 'a considerable amount of suspicious information' is presented to the insured." *N. Am. Specialty Ins. Co.,* 977 F. Supp. at 731 (quoting *Clemons v. Am. Cas. Co.,* 841 F. Supp. 160, 167 (D. Md. 1993)). Thus, this Court held that, because Ms. Stokes did not allege injuries prior to 1998, information relating to the Stokes Claim did not establish that B&R Management's answers to Question 12 and Question 14 were false at the time of the Application in 1997. *Id.* at 3-4. As such, CX Re was "entitled to believe what [B&R Management] claim[ed] to be true" in the Application, and the documents were not relevant to Jessica-Carl's defenses of limitations and laches. *Id.*

Johnson alleges that the "extraordinary situation" standard was incorrectly applied in

---

[2] Questions 12 and 14 of the Application ask, respectively, whether there was "any lead paint on any interior or exterior surface of the building" or "any paint chipping or flaking, or otherwise coming off any interior or exterior surface of the building[.]" *CX Re. v. B&R Mgmt., Inc.*, No. ELH-15-33643, ECF No. 229 at 2.

*B&R Management*, and that it is inapplicable to his laches defense. [ECF No. 89 at 7-11, 7 n.3]. To avoid the affirmative defense of laches, CX Re must have filed its claim "within three years from the date it accrue[d]." Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West). Further, "[t]he discovery rule applies generally in all civil actions brought pursuant to Maryland state law, and it provides that 'the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.'" *CX Reinsurance Co. Ltd. v. Leader Realty Co.*, 219 F. Supp. 3d 542, 546 (D. Md. 2016), *adhered to on reconsideration*, 252 F. Supp. 3d 439 (D. Md. 2017) (quoting *Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677, 680 (1981)) (hereafter "*Leader*"). Thus, inquiry notice – "'having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged [cause of action]'" – is sufficient to cause an action to accrue. *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 132 (2011) (quoting *Anne Arundel Cnty. v. Halle Dev., Inc.*, 408 Md. 539, 562 (2009)). At issue then is whether CX Re, as an insurer, is subject only to Maryland's discovery rule, or whether, as CX Re contends, the "extraordinary situation" standard informs the discovery rule and "becomes relevant when analyzing whether a reasonable insurer" in its position "would have undertaken an investigation." [ECF No. 95 at 6]. According to Johnson, because the "extraordinary situation" standard "is far more exacting" than the discovery rule requires, it is inapplicable to his defense of laches. [ECF No. 89 at 10].

Johnson is correct that the "extraordinary situation" standard is inapplicable to Johnson's laches defense. In Maryland, while the discovery rule dictates when a claim accrues, the "extraordinary situation" standard governs only an insurer's conduct at the time it is initially deciding whether to issue a policy. *See Ohio Nat. Life Assur. Corp. v. Jones*, No. CIV.A. CCB-09-2044, 2010 WL 2302360, at *3 (D. Md. June 7, 2010); *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 647 (4th Cir. 2006) (holding that in "extraordinary situations," an insurer "is under a duty to investigate *before* issuing an insurance policy") (emphasis added); *Clemons*, 841 F. Supp. at 167 (rejecting the intervenor's argument that the insurer was "estopped from asserting the material misrepresentation defense because of its own [] negligence" and stating that the duty to investigate prior to issuing an insurance policy only "exists in extraordinary situations"); *Encompass Home & Auto Ins. Co. v. Harris*, No. CIV.A. GLR-12-2588, 2013 WL 6095496, at *6 (D. Md. Nov. 19, 2013) (holding that a material misrepresentation by omission on an application may constitute an "extraordinary circumstance[]" requiring the insurer to investigate prior to issuing the policy). Thus, after a policy is issued, to avoid the affirmative defense of laches, an insurer's duty to investigate potential claims is governed solely by the discovery rule. *See Jones*, 2010 WL 2302360, at *3-5 (solely applying the discovery rule to determine when an insurer's claim for rescission based on material misrepresentation accrued); *Leader*, 219 F. Supp. 3d at 546 (holding that CX Re's claim for rescission based on an insured's material misrepresentation "simply invoke[d] the "discovery rule'").

Pursuant to the "extraordinary situation" standard, in *B&R Management*, this Court held that, at the time it issued the Policies, CX Re was entitled to rely on B&R Management's "No" answers to Questions 12 and 14 of the Application. No. ELH-15-33643, ECF No. 229 at 4. CX

Re then had not waived its claim as of the date of the Application. This Court then determined that, because there were "several ways in which B&R Management could have truthfully answered 'No' to Questions 12 and 14 at the time of the Application," even if the post-application allegations raised in the Stokes Claim were true, the documents sought could not establish a material misrepresentation on the Application. *Id.* As such, they were also irrelevant to Jessica-Carl's laches defense. *Id.*

Contrary to *B&R Management*, in this case, Johnson seeks documents which purportedly demonstrate CX Re and Pro UK's knowledge that deleterious lead paint conditions existed at Kirson properties at the time Kirson completed the Application. [ECF No. 89 at 12]. By way of example, Johnson cites documents that CX Re produced, which indicate that CX Re "incurred a loss in the amount of $225,000 in a lead paint case filed by De'Zha Newsome" against Kirson. *Id.* Ms. Newsome alleged that, while living at a property covered by the Policies, she "was exposed to lead-based paint . . . from approximately 1996 through approximately 2004." [ECF No. 89-10 ¶ 3]. Johnson thus seeks documents showing what Pro UK "learned during the pendency of the *Newsome* [litigation]" that caused CX Re to settle her case. [ECF No. 89 at 13]. Unlike the Stokes Claim in *B&R Management*, the Newsome documents may demonstrate that Kirson's Application contained falsities at the time it was signed in 1997. Moreover, according to Johnson, there are "at least 17 lawsuits by tenants in Kirson-owned properties that allege" the presence of dangerous lead paint conditions prior to or during the period of time in which Kirson signed the Application. [ECF Nos. 99 at 1-2, 99-1]. Thus, pursuant to the discovery rule, these documents, which purportedly demonstrate that Kirson's Application contained false statements at the time it was signed, may "'impact when [CX Re] in fact knew or reasonably should have known of the [the alleged misrepresentation.]'" *Leader*, 219 F. Supp. at 546 (quoting *Poffenberger*, 431 A.2d at 680)). Importantly, despite the fact that CX Re only alleges in its first amended complaint that Kirson misrepresented the answer to Question 16 (pertaining to lead violation notices), [ECF No. 17 at ¶¶ 19-22], evidence of dangerous lead paint conditions at Kirson properties as of the date of the Application may impact whether CX Re was on notice that the Application contained misrepresentations to Questions 12 and 14 and, thus, in turn, Question 16. *See Estate of Adams v. Cont'l Ins. Co.*, 161 A.3d 70, 94, *cert. denied*, 170 A.3d 294 (2017) (stating that, "[o]nce on notice of one cause of action, a potential plaintiff is charged with responsibility for investigating, within the limitations period, all potential claims and all potential defendants with regard to the injury") (quoting *Doe v. Archdiocese of Washington*, 689 A.2d 634, 644 (1997)); *SPS Ltd. P'ship, LLLP v. Sparrows Point, LLC*, 122 F. Supp. 3d 239, 245 (D. Md. 2015) (same). Therefore, these documents may be relevant to Johnson's laches defense and are properly the subject of discovery. The scope of CX Re's production must extend to documents in its or Pro UK's possession relating to, or alleging, deleterious lead paint conditions at Kirson-insured properties prior to August 1, 1997, the date in which Kirson's endorsement and the Application became effective. [ECF No. 1-2].[3]

---

[3] Because the documents are potentially relevant to Johnson's laches defense, this Court need not consider whether the documents must also be produced pursuant to Johnson's waiver argument. *See* [ECF Nos. 89 at 11-16, 99 at 14-15].

### IV. Documents in Pro IS's Possession Regarding Lead Paint Conditions at Kirson Properties.

CX Re, relying on the *Leader* decision, next argues that documents in the possession of its claims administrator, Pro IS, concerning pre-application lead-paint contamination at Kirson-insured properties, are irrelevant to Johnson's affirmative defenses "because knowledge imputed from an agent, such as Pro [IS], to its principal does not trigger the statute of limitations." [ECF No. 95 at 8]. Johnson, however, argues that the *Leader* decision does not control, because: (1) Judge Bredar "misapplied Maryland agency law, finding that knowledge of Pro IS relating to a potential rescission claim is not imputed to CXRe unless CXRe authorized Pro IS to investigate rescission claims and make recommendations to CXRe about rescission claims;" and (2) even under Judge Bredar's agency framework, there exists a factual dispute that was nonexistent in *Leader*. [ECF No. 89 at 16-22].

As background, in *Leader*, CX Re alleged that its insured, like Kirson here, falsely answered "No" to Question 16 of its insurance application. 219 F. Supp. 3d at 544. In a motion for summary judgment, the *Leader* defendants, argued that CX Re's claim was barred by laches because Pro IS had notice (more than three years prior to CX Re filing suit) that the defendants had received a lead paint violation prior to their insurance application and that notice to Pro IS, as agent, necessarily "constituted notice to CX Re." *Id.* at 547. Whether Pro IS's notice of the prior lead paint violation constituted notice to CX Re, thus, hinged on agency principles and the application of the discovery rule.

As outlined above, and as explained by Judge Bredar in *Leader*, "[t]he discovery rule applies generally in all civil actions brought pursuant to Maryland state law, and it provides that 'the cause of action accrues when the claimant in fact knew or reasonably should have known of the wrong.'" *Id.* at 546 (quoting *Poffenberger*, 431 A.2d at 680). Additionally, "the discovery rule contemplates actual knowledge that is express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Poffenberger*, 431 A.2d at 681 (citations omitted). The *Poffenberger* court further explained the distinction between actual and constructive notice:

> Notice is of two kinds actual and constructive. Actual notice may be either express or implied. If the one, it is established by direct evidence, if the other, by the proof of circumstances from which it is inferable as a fact. Constructive notice is, on the other hand, always a presumption of law. Express notice embraces not only knowledge, but also that which is communicated by direct information, either written or oral, from those who are cognizant of the fact communicated. Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact. . . . It is simply circumstantial evidence from

> which notice may be inferred. It differs from constructive notice, with which it is frequently confounded, and which it greatly resembles, in respect to the character of the inference upon which it rests; constructive notice being the creature of positive law, resting upon strictly legal presumptions which are not allowed to be controverted, whilst implied notice arises from inference of fact.

*Id.* at 680 (quoting *Baltimore v. Whittington*, 27 A. 984, 985 (1893)). The *Poffenberger* court found that constructive notice, notice imputed by law, "if deemed to be sufficient to activate the running of limitations, would recreate the very inequity the discovery rule was designed to eradicate," and, as such, held that it "does not constitute the requisite knowledge within the meaning of the rule." *Id.* at 681; *see also Windesheim v. Larocca*, 116 A.3d 954, 963 (2015) ("Unlike inquiry notice, constructive notice does not trigger the running of the statute of limitations under the discovery rule.") (citing *Poffenberger*, 431 A.2d at 681).

Thus, to establish laches, the *Leader* defendants had to prove that notice of the prior lead paint violation to Pro IS constituted actual notice to CX Re. The *Leader* defendants cited *Martin Marietta Corporation v. Gould, Incorporated*, which stated in a footnote, "[u]nder the general rule, the knowledge imputed to the principal is considered actual knowledge, not constructive." 70 F.3d 768, 773 n.4 (4th Cir. 1995); *Leader*, 219 F. Supp. 3d at 548. As Judge Bredar noted, the *Martin Marietta* court, in turn, relied upon a footnote from *Plitt v. Kellam*, A.2d 615, 619 n.4 (1960), which provided, "[t]he knowledge imputed to the principal is considered actual knowledge." *Leader*, 219 F. Supp. 3d at 548. Judge Bredar held, however, that "[t]o the extent *Plitt* may be interpreted as equating actual notice sufficient to trigger the discovery rule with knowledge imputed to a principal based upon knowledge possessed by an agent, *Poffenberger* implicitly overruled *Plitt*, well before *Martin Marietta* was decided." *Id.* As such, Judge Bredar held that any notice Pro IS possessed of the prior lead paint violation "constituted [only] constructive notice, if that, to CX Re, and under *Poffenberger* and *Windesheim*, such notice was insufficient to start the statute of limitations running." *Id.*

Importantly, Judge Bredar adhered to his decision on reconsideration, stating that the *Leader* defendants' were incorrect in believing "that notice to an agent is [necessarily] notice to a principal." *CX Reinsurance Co. Ltd. v. Leader Realty Co.*, 252 F. Supp. 3d 439, 446 (D. Md. 2017) (hereafter *Leader II*). Elaborating, Judge Bredar stated, "an agent is an agent for the limited purposes entrusted to him by the principal. Knowledge gained by the agent that is material to the performance of the agent's duties within the scope of the agent's authority can be considered knowledge of the principal." *Id.* If notice is not within the scope of the agent's authority, however, "it is not notice to the principal." *Id.* Thus, for Pro IS's notice to have constituted actual notice to CX Re, Pro IS must have been "authorized to research and make recommendations to CX Re about legal action against [the *Leader*] Defendants for having made a misrepresentation" on the insurance application. *Id.* At the summary judgment stage, and viewing the evidence in the light most favorable to CX Re, Judge Bredar relied upon the affidavits of Stephen McFeely, a Pro IS claims supervisor, and Marvin Mohn, CX Re's general counsel. *Id*. at 441, 446. Mr. McFeely attested that:

>The third-party claims administrators had no involvement with underwriting, and they did not generate or maintain in the ordinary course of their duties applications or other underwriting materials. Their duties did not include identifying or analyzing possible rescission claims based on misrepresentations made on insurance applications.

*Id.* at 441. Mr. Mohn, meanwhile, averred that: "Pro [IS's] responsibilities did not include identifying or analyzing possible rescission claims based on misrepresentations made on insurance applications. Pro UK had that responsibility." *Id.* at 442. The "undisputed evidence" at that time demonstrated that Pro IS did not analyze potential rescission claims, and, thus, that its notice of the prior lead paint violation could not constitute actual notice to CX Re to start the limitations period. *Id.* at 446. As such, the *Leader* defendants' motion for summary judgment was denied. *Id.* at 447.

Here, Johnson argues that Judge Bredar in *Leader* "incorrectly [found] that notice to an agent of CX Re is constructive and not actual notice" and, as such, contends that this Court is not bound by that decision; instead, he requests this Court to conclude that notice to Pro IS began the running of the laches/limitations period. [ECF No. 89 at 19-20]. As noted by CX Re, however, Johnson relies upon the same case law which was discussed at length in both the *Leader* and *Leader II* opinions. [ECF Nos. 95 at 10-11, 89 at 20-21]. In *Leader II*, for example, Judge Bredar demonstrated that the principle put forth in *Martin Marietta* that "knowledge imputed to the principal is considered actual knowledge" was based on *Plitt* and, in turn, *Whittington* – cases which did not involve applications of the statute of limitations or the discovery rule. *Leader II*, 252 F. Supp. 3d at 444. Moreover, prior to *Martin Marietta*, the Maryland Court of Appeals in *Poffenberger* expressly qualified *imputed* knowledge as constructive notice and stated that it "does not constitute the requisite knowledge within the meaning of the [discovery] rule." 431 A.2d at 681. Further, under Maryland agency law, knowledge is *imputed* to a principal. *Lohmuller Bldg. Co. v. Gamble*, 160 Md. 534, 154 A. 41, 43–44 (1931) (referring to knowledge of agent as imputed knowledge to principal); *Plitt*, 160 A.2d at 620 n.4 ("The knowledge imputed to the principal . . ."); *Martin Marietta*, 70 F.3d at 773 n.4 ("[T]he knowledge imputed to the principal . . ."). Thus, because this Court defers to the Maryland Court of Appeals for correct statements of Maryland law, Judge Bredar held that *Poffenberger* necessarily overruled *Plitt* and controls over the Fourth Circuit's decision in *Martin Marietta*. *Leader*, 219 F. Supp. 3d at 548. This Court adopts Judge Bredar's holdings in *Leader* and *Leader II* and finds that, to impute actual knowledge of Pro IS's notice of lead paint conditions at Kirson properties to CX Re, Johnson must demonstrate that "Pro [IS] was authorized to research and make recommendations to CX Re about legal action against [Kirson] for having made a misrepresentation" on the Application.[4] *Leader II*, 252 F. Supp. 3d at 446.

Next, Johnson argues that, under the standard set forth in *Leader II*, there now exists a factual dispute as to the scope of Pro IS's agency: whether it was authorized to research and to

---

[4] Johnson conceded that he did "not expect this Court [to] make a legal finding contrary to that of Judge Bredar." [ECF No. 89 at 22].

make recommendations to CX Re regarding litigation against Kirson for having made a misrepresentation on the Application. [ECF Nos. 89 at 18-19, 99 at 15-16]. Specifically, Johnson alleges that discovery has "revealed that the assertions in the affidavits [of Mr. McFeely and Mr. Mohn] were false" and that Pro IS did, in fact, analyze Kirson rescission claims. [ECF No. 89 at 18]. In support, Johnson cites emails written by Bart Archibald of Pro UK, which provide: (1) that he intended to ask the Pro IS "York office to review the current [] Kirson claim to see if it reveals any claims/lead violations which should have been disclosed on this application[;]" and (2) that he requested Mr. McFeely, of Pro IS, to analyze lead paint violations issued to Kirson. [ECF Nos. 89 at 18, 89-13, 89-14].]. According to Johnson, the emails, in conjunction with the fact that Pro UK and Pro IS employee email addresses share the same domain name ("@pro-global.com") and, as of 2015, were both under common control by Tawa Associates Limited, demonstrate that "Pro UK and Pro IS are closely affiliated corporate entities." [ECF No. 89 at 18-19]. CX Re, meanwhile, contends the Pro IS documents remain irrelevant because, while the two entities shared some responsibilities such as "day-to-day claims handling," identifying potential rescission claims fell solely on Pro UK. [ECF No. 95 at 13].

Here, the Archibald emails fail to demonstrate the inaccuracy of the McFeely and Mohn affidavits. The Archibald emails concerning Pro IS's responsibilities were sent in July and November of 2015. [ECF Nos. 89-13, 89-14]. Mr. McFeely and Mr. Mohn attested, however, that, as a third party claims administrator, Pro IS's duties did not include analyzing possible rescission claims, and that prior to February 10, 2014, Pro IS needed no "authority from Pro UK and, thus, had no reason" to communicate to Pro UK information about lead paint violations. [ECF Nos. 28-1 at ¶¶ 5, 7, 28-2 at ¶ 4]. CX Re initiated this litigation on October 15, 2015. [ECF No. 1]. At most, the Archibald emails purport to show that Pro IS became involved in Pro UK's rescission analysis in late 2015. Thus, because the Archibald emails do not show that Pro IS was authorized to analyze CX Re's possible rescission claims more than three years prior to CX Re filing its complaint, they cannot serve as a foundation to impute actual knowledge of prior lead paint violations at a time which would be relevant to Johnson's laches argument. As such, this Court finds that, like in *Leader II*, Pro IS's notice of lead paint conditions at Kirson properties constituted only constructive notice to CX Re, insufficient to start the running of the statute of limitations. As such, the requested documents are irrelevant and need not be produced.

> V. **Documents CX Re Redacted Pursuant to its Underwriting Review**

Finally, Johnson argues that this Court should review *in camera* certain redacted documents that CX Re produced. [ECF No. 89 at 22-23]. CX Re, citing *B&R Management*, redacted portions of its underwriting review that it contends are irrelevant, namely, documents pertaining to insureds other than Kirson. [ECF No. 95 at 13]. In *B&R Management*, this Court held that, because notice sufficient to trigger the statute of limitations is fact-specific to each insured, "documents relating to the underwriting review of insureds other than B&R Management are not relevant to this case." *B&R Management*, No. ELH-15-3364, ECF No. 192 at 3. Here, however, Johnson attempts to distinguish his request, arguing that he does not seek documents pertaining to insureds other than Kirson, but documents relating to "why CXRe commenced an underwriting review in the first place." [ECF No. 99 at 20]. Johnson's argument

is unavailing.  CX Re's "broad" underwriting review began in 2015.  [ECF No. 95 at 13].  The inquiries of notice sufficient to start the statute of limitations running and to justify rescission, and whether rescission was promptly sought, are fact-specific to each insured.  *B&R Management*, No. ELH-15-3364, ECF No. 192 at 3 (citing *Charter Oak Fire Co. v. Am. Capital, Ltd.*, No. CV DKC 09-0100, 2016 WL 827380 (D. Md. Mar. 3, 2016); *William Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 109 A.3d 639, 658 (Md. 2015)).  Thus, CX Re's rationale for initiating the review would become relevant only if Kirson-related documents prompted CX Re's underwriting review.  If, on the other hand, documents relating to other insureds caused CX Re to launch its "broad" review, they would, nonetheless, have no effect on Johnson's affirmative defenses, because the inquiry is fact-specific only to Kirson.  Because CX Re has produced all Kirson-related documents stemming from its underwriting review, Johnson's request for *in camera* review of the redactions is denied.

### VI.     Conclusion

For the reasons discussed above, CX Re's Motion to File Surreply [ECF No. 101] is GRANTED, and Johnson's Motion to Compel [ECF No. 89] is GRANTED in part and DENIED in part.  Despite the informal nature of this letter, it will be flagged as an Opinion and docketed as an Order.

Sincerely yours,

/s/

Stephanie A. Gallagher
United States Magistrate Judge